Filed 8/12/22  In re M.M. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | B311998<br><br>(Los Angeles County Super. Ct. Nos. 19CCJP04822, 19CCJP04822A ) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH M.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen C. Marpet, Judge Pro Tempore. Affirmed.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Respondent.

_____

In October 2019, the juvenile court sustained a dependency petition regarding two-year-old M., finding jurisdiction pursuant to Welfare and Institutions Code section 300[1] based on allegations of repeated instances of domestic violence between father J.M. and mother L.L. The court terminated jurisdiction at a status review hearing in March 2021, with an exit order granting sole physical custody of M. to mother. Father appeals from that exit order, arguing that the court abused its discretion in denying his request for joint physical custody of M., instead ordering continued unmonitored visitation. We find no error and therefore affirm.

## BACKGROUND

### *Prior Incidents*

Mother and father have one child together, M., born in 2017. Mother has two older children, K.C. and M.C., from a prior relationship with their father, H.C.[2] According to mother, she

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] M. is the only child subject to this appeal. Mother is not a party to this appeal. We therefore include only limited details related to mother and the other children.

and father lived together with M., K.C., and M.C. from October 2017 to October 2018. Subsequently, mother lived with the children and father visited M. often.

The family had several incidents investigated by the Los Angeles County Department of Children and Family Services (DCFS) prior to the events giving rise to the instant case. In April 2014, DCFS filed a dependency petition on behalf of K.C. and M.C., alleging a history of domestic violence between mother and H.C. The juvenile court terminated jurisdiction in April 2015 and awarded physical custody of K.C. and M.C. to mother.

In July 2017, DCFS received a referral stating that mother (then pregnant with M.), father, K.C., and M.C. were in the car together when mother and father got into an argument. Father began driving erratically, reaching speeds up to 90 miles per hour, swerving, and driving on the shoulder. When they arrived at father's home, he choked mother for several seconds. He also broke mother's car window, headlights, and taillights. Mother reported that this was the fifth time father had acted this way, and that there had been prior domestic violence incidents. DCFS closed the referral as inconclusive.

In May 2018, police officers responded to a call from mother's residence regarding domestic violence and found father outside in the front yard. Mother told the officers that she had been inside with M. when father began banging on the front door, shouting profanities, and demanding mother give him M. When mother refused, father stated he was going to break the windows in mother's car, then threatened to shoot mother. Father also stated that if mother called police, he could bail out of jail, come back, and kill mother. Mother told police that in previous encounters, father had been armed with a gun. Police arrested

3

father for criminal threats and obtained an emergency protective order for mother and M. The district attorney ultimately declined to prosecute.

In July 2018, DCFS received a referral that mother and father had argued over custody issues in front of the children, and father slapped mother across the face. Mother declined both medical assistance and an emergency protective order. The referral was closed as unfounded. In November 2018, mother called the police stating that father became angry at her, slashed her tires, then fled.

### Current Petition and Detention Report

In March 2019, mother called the police stating that she and father began to argue while exchanging custody of M. During the argument, father slashed mother's tires and broke the windows of her car. Mother again called police on May 12, 2019, after she and father got into a verbal argument at mother's residence, and father slashed her tires. Father told mother he would continue to do so every time she repaired them. The police report noted that there were "numerous prior reports between the two parties" but that mother had not assisted police in their investigations.

A police officer investigating the March and May 2019 incidents contacted DCFS on May 22, 2019, reporting that there was ongoing domestic violence and vandalism by father occurring in M.'s presence, particularly during custody exchanges. The referral to DCFS also stated that on April 23, 2019, father took M. after he smashed mother's car window and slashed her tires.

A DCFS children's social worker (CSW) met with mother on June 3, 2019. She denied any domestic violence with father. She stated that on April 23, 2019, she called police after father

4

slashed her tires, but denied that they had an altercation, that he hit her, broke her car windows, or left with M.

The CSW spoke with father on June 26, 2019. He did not recall an altercation with mother in May and declined to answer other questions on the phone, but agreed to meet in person. After several unsuccessful efforts to follow up with father, the CSW spoke with him on the phone on July 24, 2019. Father refused to give the CSW his address and stated that he would come to the DCFS office.

In a meeting on July 23, 2019, mother told DCFS that she and father were no longer together. They did not have a formal custody agreement or visitation plan in place for M. Mother stated that she was fearful of father because he was controlling and slapped and punched her in the past. Mother agreed to get a restraining order.

In the detention report, DCFS noted that father had a criminal history from 2006 to 2018, including robbery, battery on a school employee, assault with a firearm, infliction of corporal injury on a spouse or cohabitant, manufacture or possession of a dangerous weapon, and threatening a crime with intent to terrorize. DCFS opined that removing M. from father was necessary due to the multiple documented incidents of domestic violence between father and mother, all of which involved father as the aggressor and some of which occurred in M.'s presence, mother's statements that she was fearful of father, and the continuing relationship between mother and father. M. was detained from father and released to mother. When the CSW called father to inform him of the removal order and detention hearing, father denied domestic violence with mother and told the CSW to "go find someone else's family to mess up."

DCFS filed a dependency petition on July 30, 2019 on behalf of M., then 21 months old, under section 300, subdivisions (a), (b)(1), and (j).[3]  The petition alleged that mother and father had a history of engaging in violent physical and verbal altercations in M.'s presence.  The petition specifically alleged that father had slapped mother and struck her with his fists, slashed mother's car tires on three occasions, and also threatened to break her car windows.  In addition, the petition alleged that on May 15, 2019, father threatened to kill mother, resulting in his arrest for criminal threats.[4] DCFS also alleged that father had a criminal history of convictions for assault with a deadly weapon and vandalism.  Further, the petition alleged that

---

[3]     Section 300 states, in relevant part, "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  [¶](a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. . . .  [¶] (b)(1)  The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent ... to adequately supervise or protect the child. . . . [¶] (j) The child's sibling has been abused or neglected, as defined in subdivision (a), (b), . . . and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

[4]     We note that according to the police report in the record, the incident during which father slashed mother's tires and threatened to kill her, resulting in his arrest, occurred in May 2018, not 2019 as alleged by DCFS.  However, police responded to another tire-slashing incident by father in May 2019, which precipitated the instant proceeding.

mother knew of father's violent conduct but failed to protect M. by allowing father unlimited access to the child.

At the detention hearing on July 31, 2019, the court found a prima facie case for jurisdiction over M. pursuant to section 300, and no reasonable means available to protect M. without removing her from father. The court ordered M. to remain placed with mother, with twice weekly monitored visitation for father. The court granted mother's request for a restraining order through October 2, 2019.

### *Jurisdiction and Disposition*

In its jurisdiction/disposition report filed September 13, 2019, DCFS reported that it interviewed mother again on September 10, 2019. Mother stated that father had gotten mad over some small thing in May 2019 and had flattened her car tires, and that it was the third such incident. She denied that father ever hit her or threatened to kill her. She told the CSW that she had realized their relationship was "unhealthy," and father "needs help before we can be in any relationship," but that he was a "good father" to M.

DCFS also reported that it had made multiple unsuccessful attempts to contact father in August and September 2019.

In September 2019, the court continued the adjudication hearing and ordered DCFS to file a supplemental report including an interview with father. M. remained released to mother. In an October 1, 2019 last minute information, DCFS detailed an interview with father on September 30. Father stated that the allegations of the petition were "all lies and not true." He told the CSW that he had provided for and cared for M. throughout her entire life. Father told DCFS that he was the "better parent because I have my own home and [M.] has a

sibling [father's child from a prior relationship] that she can play with." He did not want to be in a relationship with mother, but wanted to "be a good parent" to M. Father stated he did not understand "why all of this is happening," that the issues were between mother and father, and that he should be able to have unmonitored visits with M.

Mother reported that on September 7, 2019, she received a call from father from an unknown number, asking where she was. She did not tell him, but father appeared at the restaurant where she was ordering food and asked her why she was "acting like this." Father also opened the back door of mother's car, gave M. a kiss, and asked mother "why are you doing this no one is trying to do nothing to you?" The next day, mother was getting out of her car at church when father pulled up. He stated he just wanted to see M. and again gave the child a kiss in the back seat of the car. Mother told DCFS that father repeatedly called her from unknown numbers and she told father to stop calling her because she did not want to lose M. On September 9, 2019, father called mother, threatened her, and accused her of seeing someone else. Mother told father to contact DCFS if he wanted to see M. Father responded that he was going to report mother to DCFS for violating the restraining order by seeing father. On September 13, 2019, mother met with several individuals from DCFS for an emergency meeting. She stated that father had been stalking her and threatening to tell DCFS that she had violated her restraining order. The team gave mother a safety plan, including changing her phone number.

The court held the continued adjudication and disposition hearing on October 2, 2019. The court sustained the petition, finding jurisdiction over M. by a preponderance of the evidence

under section 300, subdivisions (a), (b), and (j).  Additionally, the court found by clear and convincing evidence that removal of M. from father was necessary and that DCFS had made reasonable efforts to prevent removal.  The court ordered M.'s continued release to the home of mother.

The court issued a three-year restraining order on October 2, 2019, protecting mother and M. from contact from father other than approved visitation.  The court informed father that it could modify the restraining order based on his compliance and progress in his programs.  The court ordered father to have continuing monitored visitation with M. twice per week, with discretion to DCFS to liberalize.  The court also ordered father to complete individual counseling and domestic violence and parenting programs.

***Status Review Hearings***

DCFS filed a last minute information in January 2020, reporting that a CSW attempted to contact father on November 25, 2019 to set up monitored visits with M.; when father did not answer his phone, the CSW left a voicemail.  Father never returned the call.  On January 21, 2020, a CSW called father to ask about his progress with the court-ordered programs.  Father stated he would need to find that information as he did not have it "in front of him."  He was unable to provide further information regarding days and times of his programs.  Father told the CSW that "this whole thing became twisted and you all lied to me," and then stated he was suspicious of the CSW's identity.  DCFS also attached certificates of completion for several of mother's programs.

In a March 20, 2020 status review report, DCFS reported that mother was engaged in the proceedings and demonstrated

commitment to M., who appeared comfortable in her care. Father spoke with a CSW on January 28, 2020 and reported that he had enrolled in counseling approximately two weeks ago. The CSW confirmed on March 10, 2020 that father had enrolled in domestic violence and parenting classes. Father agreed to a meeting at the DCFS offices on March 10, 2020, but then notified DCFS that he could not attend. Father agreed to speak by telephone, and stated that DCFS had not helped him with his case, failing to reach out for several months. Father stated he did not agree with his lack of visits with M., and that he wanted to see her every day. Father requested having visits in his home and stated that paternal aunt would agree to be approved as a monitor. Father told the CSW that he was a good father, he "did not do anything," he had never been arrested, and he did not understand why he was involved in a DCFS case.

DCFS reported that it had spoken with paternal aunt on February 21, 2020 regarding serving as father's visitation monitor. DCFS informed her that she could come to the DCFS office to live-scan; as of mid-March, paternal aunt had not done so. DCFS also reported that mother was in full compliance with her case plan and consistently met M.'s needs. DCFS recommended terminating dependency jurisdiction with a family law order granting mother sole physical custody, with continued monitored visitation for father.

The court continued the section 364 review hearing[5] several times due to the COVID-19 pandemic, from May to September, then to December 2020. In August 2020, DCFS reported that

---

[5] Section 364 governs status review hearings for dependent juveniles who remain in the physical custody of a parent or guardian.

father had been terminated from his individual counseling program after missing multiple sessions. However, he had almost completed his parenting classes and was making progress with his domestic violence classes online. DCFS also reported that as of August 14, paternal aunt had not completed her live-scan, and father had "held no telephonic, in-person, or written communication" with M.

On November 23, 2020, father told a CSW that he did not believe DCFS had helped him toward closing his case. He had not re-enrolled in individual counseling, but had completed 40 of 52 sessions of his domestic violence program and all of his parenting program except for one final assignment. The CSW reported that father had not provided any information for anyone who could monitor his visits and had not had any visits with M. since the case was opened. DCFS again recommended terminating the case with custody to mother and monitored visitation for father.

At a hearing on December 17, 2020, father's counsel requested liberalization of his visits and argued that he was in substantial compliance with his case plan. He stated that father had "tried" to visit M. but "has had a difficult time communicating with the social worker." The court set a contested review hearing regarding whether father's visits should be liberalized. The court noted that father seemed to be doing well in his programs and ordered DCFS to look into liberalizing his contact.

DCFS filed a last minute information on January 29, 2021, reporting that father had completed two sessions of individual counseling. Father also had completed his domestic violence and parenting programs. Paternal aunt began monitoring visits for

father on December 31, 2020. She told DCFS on January 28, 2021 that father had completed three-hour visits once per week at a local mall for the past month and that father was attentive, thoughtful, and loving with M. She opined that the visits would be more productive in a home-based setting.

DCFS inspected father's home on January 26, 2021 as part of its consideration of liberalizing father's visitation. Father's home was appropriate and one bedroom was furnished with a bunk bed, which father indicated was the room of his nine-year-old daughter (M.'s half-sister) that M. would share during overnight visits. Father told the CSW that he was angry, as he had "done everything" and believed DCFS and the court had treated him unfairly. The CSW again spoke with father the next day; the CSW reported that father shared what he had learned from his programs, despite his continued anger over his belief that he had been unfairly treated.

DCFS granted father liberalized visitation on January 28, 2021. The schedule allowed father unmonitored visitation for four hours on Saturdays at his home beginning January 30, 2021, increased to eight hours on February 6, 2021, and liberalized to overnight visits the following week. Paternal aunt would continue to transport M. between father and mother in compliance with the restraining order. DCFS continued to recommend that the court terminate dependency jurisdiction, with sole physical custody to mother, but updated its recommendation to unmonitored visitation for father.

In a March 2021 last minute information, DCFS reported that mother had no concerns with the visits between M. and father. On February 24, 2021, father told DCFS that the visits

were going well and that he wanted to be a part of M.'s life. Father continued to complete his counseling sessions.

The court held the continued review hearing on March 24 and 25, 2021. M.'s counsel stated that she did not object to DCFS's recommendation regarding physical custody to mother and unmonitored visitation to father, noting that M. "seems to be doing okay after the visits." Father's counsel asked the court to consider granting physical custody to both parents, arguing that father had completed his case plan and the overnight visits were going well. He stated that father had "done everything that the court has asked." Counsel for DCFS disagreed, stating that father "finally signed up for individual counseling in January," and had completed only two sessions. She urged the court to adopt DCFS's recommendations. The court indicated it would order unmonitored and overnight visits, to be scheduled by agreement between mother and father or through mediation.

The court found that the conditions justifying initial assumption of jurisdiction no longer existed and were not likely to exist if supervision was withdrawn. The court therefore terminated jurisdiction, awarding joint legal custody to mother and father and sole physical custody to mother. At father's request, the court also vacated the restraining order. On March 30, the court issued a juvenile custody order, including unmonitored visitation for father.

Father timely appealed from the March 2021 orders.[6]

---

[6] Father's counsel initially filed a brief pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835, 845, asserting that he found no colorable issues to raise on appeal. He subsequently filed a motion to strike that brief and replace it with a new opening

## DISCUSSION

Father argues on appeal that the juvenile court abused its discretion in denying his request for joint physical custody at the time it terminated jurisdiction, instead granting him continued unmonitored visitation with M. We find no abuse of discretion.

### I.     *Legal Principles*

Section 362.4 governs the termination of juvenile court jurisdiction and related orders. The statute authorizes a juvenile court to make custody and visitation orders upon terminating dependency jurisdiction over a child. (§ 362.4, subd. (a).) These exit orders remain in effect until modified or terminated by a subsequent order of the superior court. (§ 362.4, subd. (b); see also Cal. Rules of Court, rule 5.700.)

"When making a custody determination under section 362.4, 'the court's focus and primary consideration must always be the best interests of the child.'" (*In re T.S.* (2020) 52 Cal.App.5th 503, 513, quoting *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 (*Nicholas H.*).) "The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child." (*In re Chantal S.* (1996) 13 Cal.4th 196, 201 (*Chantal S.*).) Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, "[t]he presumption of parental fitness that underlies custody law in the family court just does not apply. . . . Rather the juvenile court,

---

brief, contending that upon further review of the record, he wished to raise the instant argument regarding error by the juvenile court. We granted that motion and proceed to consider the arguments raised in father's opening brief. Father did not file a reply brief.

which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions." (*In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712 (*Jennifer R.*); accord *Chantal S., supra*, 13 Cal.4th at p. 206.)

"[T]he juvenile court has broad discretion to make custody [and visitation] orders when it terminates jurisdiction in a dependency case (§ 362.4)." (*Nicholas H., supra*, 112 Cal.App.4th at p. 265, fn. 4.) We review the juvenile court's exit orders for an abuse of that discretion. (See, e.g., *In re Maya L.* (2014) 232 Cal.App.4th 81, 102; *Jennifer R., supra*, 14 Cal.App.4th at p. 711; see also *In re Stephanie M.* (1994) 7 Cal.4th 295, 318 ["[W]hen a court has made a custody determination in a dependency proceeding, '"a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.""].)

## II.     *The Juvenile Court Did Not Abuse Its Discretion*

Father contends that the juvenile court erred in denying him joint physical custody of M. because there was no evidence of a risk of harm to the child. He reasons that when the court agreed to allow him unsupervised visitation, it necessarily found that there was "no jeopardy to the child's safety" in his care, and thus lacked a basis to deny him physical custody. He cites no authority for the proposition that DCFS's decision to liberalize visitation from monitored to unmonitored requires a finding by the court that he was also entitled to joint physical custody of M. He cites section 362.1, subd. (a)(1)(B), which simply authorizes the imposition of supervised visitation where unsupervised visitation would jeopardize the child's safety. By father's logic,

15

any time the juvenile court found it was sufficiently safe to allow unmonitored visitation, the court would also be required to order physical custody for that parent.

We also reject father's argument that the juvenile court's decision to terminate jurisdiction over M. compelled a finding that it was in M.'s best interest to grant joint physical custody. Section 364, subdivision (c) provides that the juvenile court "shall terminate its jurisdiction unless the social worker . . . establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." Father has not challenged the court's termination of jurisdiction based on its findings that the condition giving rise to the assumption of jurisdiction—namely, the domestic violence arising out of mother and father's relationship—no longer existed and was unlikely to reoccur if the court terminated jurisdiction.

On the other hand, the court's determination of appropriate custodial orders required an analysis of M.'s best interest. The juvenile court here found that it would be in M.'s best interest to continue father's unmonitored visitation, rather than granting joint custody to father and mother. We find no abuse of discretion in this conclusion. M. had lived with mother her entire life. Father did not visit M. at all for over a year, from July 2019 to December 2020, other than a few instances in September 2019 when he attempted to do so in violation of the restraining order. Although father's recent visits were going well, he had only been consistently visiting M. for three months at the time jurisdiction was terminated, with only two months of unmonitored visits. Further, father had not fully completed his case plan, as he had

16

only recently re-enrolled in individual counseling and completed just two sessions. DCFS also noted that despite completing several programs, father continued to deny all wrongdoing and blame DCFS and the court for the dependency proceedings. Both DCFS and M.'s counsel requested visitation, rather than custody, for father. On this record, the court did not abuse its discretion in finding that it would be in M.'s best interest to award sole physical custody to mother.

Father's contention that the court failed to consider the totality of the circumstances and failed to consider M.'s best interests is unsupported by the record. "The Welfare and Institutions Code does not require a specific statement of reasons be given when making a custody order. Nor did [father] request such a statement. The court's order was sufficient to generally show the basis for its ruling." (*Jennifer R.*, *supra,* 14 Cal.App.4th at pp. 713-714.) Moreover, father cannot show any prejudice, as "the record is clear as to the circumstances leading to the denial of joint [physical] custody. Should circumstances change in the future[, father] is free to seek joint [physical] custody in the family law court." (*Ibid*.)

## DISPOSITION

The juvenile court's order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.                                          CURREY, J.


17